**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TAMARA FOUCHE and ADRIANA UNDERWOOD, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:23-cv-02232 |
| v. | ) ) | |
| CHICAGO POLICE OFFICER WILLIAM GROSSKLAS (#17311), SUPERINTENDENT DAVID BROWN, and CITY OF CHICAGO, | ) ) ) ) ) ) | Judge Thomas M. Durkin Magistrate Judge Jeffrey T. Gilbert JURY DEMAND |
| Defendants. | ) | |

## AMENDED COMPLAINT

1.      During the summer of 2020, the United States was in the throes of the largest social justice movement in history.  In a repudiation of anti-Black racism, white supremacy, police violence, and mass criminalization and incarceration, millions joined demonstrations around the globe—often lifting up the names of George Floyd, Breonna Taylor, Tony McDade, Jacob Blake, and too many other Black people killed by police.

2.      Plaintiffs as well as thousands of other organizers, activists, and community leaders in Chicago—multi-racial and intergenerational in composition—engaged in a wide range of actions throughout the summer of 2020, including rallies, marches, and other creative protests that consistently opposed racist police violence and demanded substantial changes, including the massive reduction of taxpayer money being used to fund the Chicago Police Department ("CPD").

3.      The CPD and other City agencies responded to these demonstrations with brutal, violent, and unconstitutional tactics that are clearly intended to injure, silence, and intimidate

1

Plaintiffs and other protesters. These abuse tactics include beating protesters with batons—often striking them in the head; tackling and beating protesters while on the ground; using chemical agents against protesters; falsely arresting protesters; and trapping protesters in enclosed areas.

4.     CPD consistently targeted protest leaders, marshals, legal observers, medics, and individuals recording the demonstrations with unlawful, retaliatory, and lethal force.

5.     CPD also targeted protesters' property—destroying cameras, phones, and eyeglasses; and confiscating bikes, backpacks, and other belongings.

6.     CPD officers' animus against Plaintiffs and other protesters is unmistakable— they regularly called protesters vile and vulgar names, often using misogynistic and homophobic words. Officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes, and other inappropriate behavior at these protests.

7.     CPD's response to the summer 2020 protests is consistent with the CPD's long-standing policies and practices of using abusive tactics and excessive force against protesters seeking progressive social and political change, including most infamously the assassination of Illinois Black Panther Party Chairman Fred Hampton and member Mark Clark in working in concert with the FBI and Cook County State's Attorney Office. Dating as far back as 1877, CPD began its long history of using excessive force to quell protesters' rights by targeting protests for labor reform and the eight-hour day. Their unconstitutional practices against protesters continued throughout history, including, *inter alia*, through the 1919 race riots, the 1968 Democratic National Convention, the 1977 marches against housing discrimination, the 1990 Gulf War protests, the demonstrations in support of people with HIV/AIDs and against governmental indifference led by ACT-UP and others in 1990s and early 2000s, the 2003 mass

anti-Iraq War demonstration, and a counter demonstration to the Presidential candidate Trump's scheduled rally at UIC in 2016, to name a few.

8.      These systemic and ongoing violations continue to occur despite the City of Chicago being subject to a Consent Decree for almost two years.  CPD's documented failure to comply with the Consent Decree deadlines coupled with its consistently illegal and violent response to the summer 2020 protests demonstrate that the Consent Decree has entirely failed to create any meaningful change in the CPD.

9.      CPD's unconstitutional policies and practices against protesters has caused Plaintiffs significant harm, including the violation of their constitutional rights as well as physical, emotional, and mental injuries.

<strong>JURISDICTION AND VENUE</strong>

10.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under Illinois state law.

11.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

<strong>PARTIES</strong>

12.      Plaintiff Tamara Fouche is a 32-year-old[1] Black resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Fouche attended a protest in downtown Chicago on May 30, 2020.

---

[1] The Plaintiffs' ages listed here are their ages at the time the original complaint was filed on November 19, 2020.

13.     Plaintiff Adriana Underwood is a 22-year old white resident of Chicago, Illinois who uses she/her pronouns.  Plaintiff Underwood attended a protest in downtown Chicago on May 30, 2020.

14.     Defendant City of Chicago is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois.  It is authorized under the statutes of the State of Illinois to maintain the Chicago Police Department, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible.  Defendant City was, at all times material to this Complaint, the employer and principal of the Defendant Officers.

15.     Defendant David Brown is the Superintendent of the Chicago Police Department. At all times relevant to the events at issue in this case, Defendant Brown was employed by the CPD.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Brown promulgated rules, regulations, policies, and procedures of the CPD. Defendant Brown is responsible for supervising all CPD officers and managing all operations at the CPD.  He is sued here in his official and individual capacities.

16.     Defendant Officer William Grossklas (#17311) is a City of Chicago employee with the CPD.  At all times relevant to the events at issue in this case, this defendant was acting under color of law and within the scope of his employment with the CPD.  He is sued in his individual capacity for violating Plaintiffs' rights guaranteed by the U.S. Constitution and Illinois state law.

**FACTUAL ALLEGATIONS**

**I.      The CPD's Violent and Unconstitutional Response to Protesters Throughout the Summer of 2020**

4

17.    On May 25, 2020, Minneapolis police officers murdered George Floyd when they suffocated him to death while he was handcuffed in a prone position on the ground in broad daylight on the street.  Floyd begged to breathe, for his mother, and for his life, and witnesses begged the officers to let him go, before he ultimately took his last breath.

18.    Floyd's murder and the police murder of Breonna Taylor in her home in Louisville, Kentucky, in addition to recent police murders of too many additional Black people throughout the United States, sparked the largest social justice movement in the history of the United States and has included protests around the world against anti-Black police violence, white supremacy, systemic racism, and inequality.

19.    Since May 29, 2020, there have been numerous protests and actions throughout the City of Chicago—ranging in size from a few dozen people to thousands.  These protests have occurred all throughout Chicago, including in the Loop and on the South, West, and North sides, and have been attended by people of all ages, races, and demographics.  In particular, protests occurred on May 29-May 31, June 1, July 17, and August 15, 2020.

20.    The CPD responded to these protests with brutal, violent, and unconstitutional tactics that were clearly intended to injure and silence protesters who were protesting their violence and the violence of other state actors.

21.    CPD officers consistently targeted protesters who are peacefully exercising their First Amendment rights with unlawful, retaliatory, and lethal force.

22.    Protesters often reported that CPD officers intentionally struck them on their head with batons with enough force to leave people bloodied and in some instances with serious concussions.



23.     On June 23, 2020, the Chicago Reader published an in-depth examination of the

CPD's use of lethal force, including baton strikes to the head, during the May 2020 protests

(excluding protests in June, July, and August).  The reporter documented:

> 83 baton strikes on at least 32 different people by officers, most captured on video.
> Nearly all appear to violate [CPD] policy, with more than half of the strikes on video
> involving police beating people who were already on the ground.  Multiple videos also
> show officers hitting protesters in the head with batons despite rules limiting these strikes
> to situations requiring deadly force.[2]

24.     The Chicago Reader article notes that these unlawful uses of force often occurred

in full view of supervisors who failed to intervene and that most officers failed to report their

uses of force.

25.     The CPD's brutal response to these protests and protesters has also included

police officers:

    a.  driving CPD cars through crowds of protestors;

    b.  punching protesters in the face;

    c.  tackling protesters to the ground;

---

[2]  Andrew Fan and Dana Brozost-Keller, Cops Appear to violate use-of-force rules dozens of times at
protests, Chicago Reader (June 23, 2020), https://www.chicagoreader.com/chicago/police-baton-use-of-
force-protests/Content?oid=80849109.

    d.   kneeing protesters in the neck and back;

    e.   kicking protesters in the legs to cause them to fall;

    f.   jabbing batons into protesters' bodies;

    g.   trapping protesters on bridges, pushing protesters stranded on bridges, pinning protesters against hard surfaces on bridges and other locations;

    h.   using tear gas and pepper spray;

    i.   dragging protesters through the streets;

    j.   stomping on protesters on the ground; and

    k.   beating protesters severely with batons.

These acts of violence were wholly unwarranted and there was no objectively reasonable basis to use such dangerous and violent force.

26.    CPD officers also targeted those the CPD has identified as protest marshals, legal observers, medics, or leaders with the most brutal violence apparently as part of a strategy to quell the protesters' free expression.

27.    CPD officers also used violence on protesters who expressed concern or were protesting that CPD officers were harming other people at the protests.

28.    CPD officers also targeted those who were filming, or otherwise documenting police violence at the protests, by pushing, shoving, brutalizing, and harassing them in the midst of the protests. Often this resulted in confiscated or damaged cameras and recording equipment and physical injury to protesters exercising their First Amendment right to record the police.

29.    CPD officers were also aggressive, rude, disrespectful, and often affirmatively escalated encounters through taunts, shoves, pushes and other inappropriate behavior at these protests. CPD officers used particularly hostile language towards women and members of the LGBTQ community.

30. CPD officers' animus against protesters is unmistakable—they regularly referred to protesters with terms that are vile, misogynistic, and anti-gay, including officers calling protesters "pussy," "cunt," "bitch," and "faggots," and repeatedly use the word "fuck" when issuing commands. One officer threatened protesters by yelling "you fucking bitch," and "wait till I get my badge off, you fucking faggot."[3]

31. CPD's response to the protests also reflects a pattern and practice of breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, backpacks, and, in some instances, canes used to assist with mobility.

32. CPD has also engaged in a systemic practice of illegal searches of protesters, seizure of protesters, and false arrest of protesters.

33. Throughout the protests, the CPD has also engaged in racially motivated arrests of protesters, even though the protests were attended by multi-racial crowds of people, the majority of whom were white. According to CPD records, during the initial weekend of protests (May 29 – 31) CPD arrested 2,172 people. According to the Chicago Reader, the vast majority of those arrested, over 70 percent, were Black Chicagoans; however, only 32 percent of the City of Chicago identify as Black people.[4]

34. Despite widespread evidence of unchecked police violence, throughout these events, Mayor Lori Lightfoot has praised the police for their "restraint."

35. As of February 2021, protesters filed 591 protest-related complaints against CPD officers. 58% of those complaints alleged excessive force and 9% alleged verbal abuse. The

---

[3] John Wright, Chicago Officer Who Called Protester a 'F-king Faggot' Likely to Be Stripped of Police Powers: WATCH, Towleroad (June 11, 2020), https://www.towleroad.com/2020/06/chicago-officer-who-called-protester-a-f-king-faggot-likely-to-be-stripped-of-powers-watch/.
[4] Kiran Misra, Most of the people arrested at the protests were Black, Chicago Reader (June 30, 2020), https://www.chicagoreader.com/chicago/protest-arrests-racial-disparity/Content?oid=81018291.

number of protest complaints is so large, the Civilian Office of Police Accountability ("COPA")

formed a specialized team of investigators solely dedicated to investigating these allegations.[5] As

a result of COPA's preliminary investigations into the protest complaints, it referred 5 officers to

state/federal law enforcement for potential criminal prosecution and has recommended that 8

officers be assigned to modified duty and/or be relieved of police power.  No other officers

involved in protest-related abuses have been disciplined thus far.[6]

36.    During a City Council budget hearing, COPA's Chief Administrator, Sydney

Roberts, informed City lawmakers that "several themes were prevalent" throughout the protest

complaints including "excessive use of batons," "excessive verbal abuse" and the failure of

officers to comply with CPD's body camera policy as well as policies requiring Chicago police

officers to display their names and badge numbers.[7] Chief Roberts also noted that these themes

were so "consistent across multiple investigations" that she sent a memo to CPD leadership

urging it to "take immediate action to address the deficiencies."[8]  Upon information and belief,

Defendant Superintendent Brown received Chief Robert's memo during the Summer 2020

uprisings and failed to take any action to redress the documented deficiencies.

37.    Pursuant to the relevant Chicago code provisions, Defendant Superintendent

Brown is "responsible for the general management and control of the Police Department" and

has "full and complete authority to administer the Department."[9]  Defendant Superintendent

Brown made all command decisions about the Chicago Police Department's systematic response

---

[5] Fran Spielman, CPA chief says recurring themes dominate complaints against CPD during civil unrest, Chicago Sun-times (Nov. 10, 2020), https://chicago.suntimes.com/2020/11/10/21559391/chicago-police-reform-copa-chief-recurring-themes-dominate-complaints-against-cpd-civil-unrest.
[6] https://www.chicagocopa.org/data-cases/protest-related-information/
[7] Id.
[8] Id.
[9] Chicago Municipal Code § 2-84-040

to protesters during the 2020 uprisings. Defendant Superintendent Brown, through actions both explicit and implicit, authorized and directed the unlawful conduct described throughout this complaint. He encouraged and permitted Chicago police officers to target, attack, and harass protesters with violent animus and took no action to halt Chicago police officer's systemic violence against protesters for Black lives. Further, Defendant Superintendent Brown was physically present for at least one protest where he described standing "shoulder to shoulder" with Chicago police officers. During the protest(s) Defendant Superintendent Brown attended personally, he failed to intervene to stop officer violence and misconduct.

38.     In an apparent effort to justify and/or conceal his officers' brutal violence and unlawful conduct, Defendant Superintendent Brown made a number of false and misleading statements to the media about the Summer 2020 uprisings and the actions of Chicago police officers. For example, in reference to the August 15, 2020 downtown protest Defendant Superintendent Brown stated that he and his officers "trailed along" the protesters until the protesters became "confrontational" and began assaulting officers. Defendant Superintendent Brown asserted that his officers did not engage in the practice of kettling (i.e., detaining a mass of people without justification and failing to provide people opportunities to leave). After an investigation, a media outlet labeled these assertions as "false" and found evidence of kettling and video depicting Chicago police officers chasing demonstrators and witnesses who described Chicago police officers attacking protesters who did not immediately disperse.[10] The same outlet also declared that Defendant Superintendent Brown publicly expressed a number of

---

[10] Jim Daley and Jason Schumer, Fact-Checking Police Supt. David Brown on August 15, South Side Weekly (Sept. 2, 2020), https://southsideweekly.com/fact-checking-david-brown-august-15/.

misleading and unsubstantiated negative statements about protesters including that they carry mace and were "agitators [who] hijacked a peaceful protest."[11]

39.     On October 13, 2020, Defendant Superintendent Brown acknowledged serious ongoing and systemic deficiencies within the CPD during his address to new CPD recruits. Defendant Superintendent Brown informed the recruits that "this civil unrest is about you." He informed them that they would be working alongside officers who "never should have been hired" and "who have lost their way" and that, despite the existence of these officers, the new recruits must "discern" right from wrong. During the same address, Defendant Superintendent Brown also acknowledged that "good cops don't tell on the bad cops" and that CPD has a culture of "protecting each other" and that it is difficult for officers to "hold each other accountable."[12]

## II.     Protesters' Rights Were Violated at Protests Throughout the City

### A.     May 29-31, 2020 Demonstrations Downtown

40.     In the wake of the police murders of George Floyd, Breonna Taylor, and other Black people, there were massive demonstrations against anti-Black police violence in downtown Chicago and the River North area over the weekend of May 29-31, 2020.

---

[11] *Id.*

[12] 'This Civil Unrest Is About You': Police Superintendent David Brown Gives Passionate Speech to New Recruits, NBC Chicago (Oct. 13, 2020), https://www.nbcchicago.com/top-videos-home/this-civil-unrest-is-about-you-police-superintendent-david-brown-gives-passionate-speech-to-new-recruits/2353284/.









Chicago police officers clash with protesters Saturday near Kinzie and State streets as thousands in Chicago joined national outrage over the death of George Floyd, who died in police custody on Memorial Day in Minneapolis. | Ashlee Rezin Garcia / Sun-Times

### i. May 30, 2020 Abuse of Plaintiff Tamara Fouche (State Street Bridge)

41.     On May 30, 2020, at approximately 2:00 p.m., Plaintiff Tamara Fouche joined a protest at around State and Lake Street.

42.     At approximately 7:15 p.m., Plaintiff Fouche was on the State Street bridge, sitting on the metal traffic divider, when numerous Chicago police officers aggressively marched toward her and other protesters and ordered them to move.

43.     Before Plaintiff Fouche had an opportunity to move off of the divider, Defendant Officer William Grossklas (#17311), without justification, pushed her with extreme force in the middle of her back, causing her neck to snap backward and causing her to fall off of the divider.

44.     Plaintiff Fouche did not physically attack, assault, threaten, or resist Defendant Officer Grossklas or any other police officer at any time or in any way.

45.     Plaintiff Fouche did not commit any unlawful act and was engaging in constitutionally protected activity.

46.     As a direct and proximate result of the Defendant Officer's actions as detailed above, Plaintiff Fouche suffered and continues to suffer, *inter alia*, bodily injury, pain and suffering, extreme mental distress, anguish, and fear.

### ii. May 30, 2020 Abuse of Plaintiff Adriana Underwood (Federal Plaza)

47.     In the afternoon on May 30, 2020, Plaintiff Adriana Underwood joined the demonstration against anti-Black police violence and systemic racism at Federal Plaza in downtown Chicago.

48.     After protesting throughout the Loop, the march headed toward Lakeshore Drive that evening.  At this point, Plaintiff Underwood split off from the group to try to return to her car, but Chicago Police officers were preventing protesters from crossing several of the bridges

downtown. An unidentified female-presenting officer told Plaintiff Underwood that she could still use the Wabash bridge.

49.     When Plaintiff Underwood reached the Wabash bridge, she sat on the barrier that divides the sidewalk from the road, facing the road. There were other people sitting along the barrier across the bridge.

50.     Plaintiff Underwood and the surrounding people she observed were sitting calmly on the bridge.

51.     At approximately 7:00 p.m., while Plaintiff Underwood and other protesters were sitting on the Wabash bridge, numerous Chicago police officers began to aggressively advance towards her and other protesters and ordered them to move.

52.     Plaintiff Underwood and the other protesters were not given any time to move or leave the area.

53.     As the Chicago police officers advanced, Defendant Officer Grossklas came up behind Plaintiff Underwood and used his forearm to forcefully shove Plaintiff Underwood on her lower back, pushing her off the barrier and into the road. Defendant Officer Grossklas pushed Plaintiff Underwood without any warning or justification.

54.     Plaintiff Underwood landed in front of an unidentified Chicago police officer, who did not intervene when Plaintiff Underwood pointed out that she had just been pushed without warning or justification.

55.     Plaintiff Underwood observed Defendant Officer Grossklas continuing to advance down the bridge and push other protesters from the barrier without justification.

56.     Plaintiff Underwood did not physically attack, assault, threaten, or resist Defendant Officer Grossklas or any other officer at any time or in any way.

57.     Plaintiff Underwood did not commit any unlawful act and was engaging in constitutionally protected activity.

58.     As a direct and proximate result of the actions by the Defendant Officers as detailed above, Plaintiff Underwood suffered and continues to suffer, *inter alia*, pain and suffering, extreme mental distress, anguish, and fear.

### B. May 31, 2020 Demonstration in Hyde Park

59.     On May 31, 2020, several hundred individuals attended a protest in Hyde Park on Chicago's Southside. During this action, Chicago police officers targeted Black organizers and activists with violent and often lethal force. Chicago police officers used particularly violent and retaliatory force against prominent Black leaders who attempted to help other protesters navigate a protest dispersal.

### C. June 1, 2020 Demonstrations in Uptown and Old Town

60.     On June 1, 2020, several hundred people attended a demonstration in the Uptown neighborhood in Chicago that began in the late afternoon.  After a series of speeches, the demonstration began to march on City streets, including on Lake Shore Drive.  As the demonstration continued on throughout the evening, the numbers of protesters began to dwindle. As the numbers diminished, many protesters headed toward the Wilson stop of the CTA located at Wilson and Broadway.  At or near Wilson and Broadway, Chicago police officers without warnings advanced on protesters and attacked them with batons.

61.     During the afternoon of June 1, 2020, scores of high school students and others participated in a demonstration against anti-Black police violence in support of Black lives at around Division and Larrabee in Old Town, Chicago.  Chicago police officers, armed with shields and batons, and some with the use of bicycles, walled off the streets and eventually

encircled the protesters. Without issuing any orders to disperse, Chicago police officers then began using their bicycles, shields, or batons to push protesters back while yelling at them to move, even though the protesters had nowhere to go because they were hemmed in by Chicago police officers on all sides.

**D. July 17, 2020 Black, Indigenous Solidarity Rally (Decolonize Zhigaagoong) in Grant Park**

62.     On July 17, 2020, hundreds of protesters participated in a demonstration to demonstrate solidarity for Indigenous people's struggles against colonization, genocide, and to oppose the prominent tribute to Christopher Columbus, embodied by the statue of him in Grant Park, Chicago.

63.     The demonstration started at Buckingham Fountain with a series of speeches and prayer, and later progressed into a march that headed south on Columbus Drive to Grant Park.

64.     At Grant Park, protesters marched into the park and surrounded the statue of Columbus, which was heavily guarded by Chicago police officers.

65.     A small group of individuals in the protest threw frozen water bottles and other objects at the Chicago police officers, causing the officers to retreat from the statue and the park. These handful of protesters then attempted to pull the statue down with rope.

66.     Chicago police officers then returned to the park attempting to retake the statue and in the process engaged in extreme forms of violence in retaliation for the actions of a small minority.



67.     Police officers descended into the park swinging their batons and hitting people's heads and bodies, indiscriminately using pepper spray or tear gas on the entire crowd of demonstrators, without justification, causing many people to experience trouble breathing, and engaging in other forms of violence.



68.     In addition to the excessive force, Chicago police officers forcibly took over 70

bicycles away from the protesters and refused to return them that evening.[13]



### E. August 15, 2020 Demonstration Downtown

69.    On August 15, 2020, hundreds of protesters participated in a demonstration downtown that began in the afternoon. The protesters started at Millennium Park and marched through the streets of downtown before Chicago police officers blocked their route and became aggressive. Officers surrounded protesters on all sides, engaging in the unlawful tactic of "kettling," and brutally beat many protesters, including youth.

---

[13]   Monica Eng, What Happened to the 76 Bikes Chicago Police Took After Friday's Clash with Protesters?, WBEZ (July 21, 2020), https://www.wbez.org/stories/what-happened-to-the-76-bikes-chicago-police-took-after-fridays-clash-with-protesters/ae29fb14-3189-4044-9896-c1d416b5c515.









III.   **CPD's Policy and Practice Failures: Using Force Against Protesters, Unreasonable Force When No Force Is Required, and Failure to Discipline/Code of Silence**

70.    The City's long standing policies, practices, and customs for shutting down protests are the direct and proximate cause of the constitutional violations outlined in this Complaint.  The Plaintiffs suffered abuse at the hands of Chicago police officers in different parts of the City, however, each instance of harm was a direct result of the City's deficient policies and practices as detailed below.

A.   **CPD's Policy and Practice of Using Unreasonable Force, Violence, and False Arrests to Quell Protest**

71.    For over 100 years, CPD has inflicted unjustified beatings on people exercising their right to assemble and protest.  CPD also has a well-documented process of arresting protesters without probable cause—unlawfully depriving people of their freedom in retaliation for their protest activities.  Protesters taking to the streets to bring attention to unjust labor practices, segregation and other vestiges of white supremacy, AIDS-related public health crisis, war, and police murder of Black people have experienced brutal violence at the hands of CPD officers.  Throughout its history, CPD has falsely arrested thousands of protesters.

72.    As described further below, CPD's violent protest-related policies and practices were first widely documented in 1855 and have continued for over a century.  CPD's response to the Summer 2020 uprisings demonstrate that the department's long history of brutalizing protesters and subjecting them to false arrests has not abated for over 165 years.

i.   **The Haymarket Incident**

73.    The modern CPD was established in 1855 to quell labor protests that had arisen in Chicago.  Elected officials established the new military-style police department not to fight crime, but to maintain order among wage workers who were overwhelmingly from immigrant

22

communities and who were protesting for fair labor practices.

74.     In 1877, the CPD used violent tactics in an attempt to thwart protests.  On July 25, 1877, a group of labor reformers requested police protection for a peaceful meeting about working conditions.  Instead of protecting the group, CPD broke up the group by beating them with batons.  The Police Superintendent at the time stated the police would have opened fire on the crowd if there were not small children in the area.

75.     On July 26, 1877, the Deputy Superintendent ordered CPD officers to fire into a new crowd of protesters, killing an untold number of protesters and using batons against hundreds more.

76.     CPD's pattern and practice of using violence against protesters continued in 1886 during what is now referred to as the Haymarket Incident.  At the time, workers were striking for an eight-hour work day.  During one strike on May 3, 1886, approximately 200 police officers opened gun fire and used batons on strikers, killing between 2 and 6 strikers.

77.     The following day on May 4, 1886, approximately 2,000 labor protesters rallied in Haymarket Square in support of the strikers.  CPD officers advanced into the crowd in an attempt to disperse the gathering when an unknown individual threw an explosive device that instantly killed a police officer.[14]  In response, CPD officers opened fire into the crowd creating a scene the Chicago Tribune described as "wild carnage" where at least fifty dead or wounded civilians lay in the streets.[15]

78.     Historians have documented that CPD officials knew, in the immediate aftermath of this incident, that its officers engaged in reckless, deadly force.  A CPD captain filed a report

---

[14]  Iam Hernon, The Wild East: Gunfights, Massacres and Race Riots Far From America's Frontier.
[15]  *Id.*

stating that "the number of wounded workers was largely in excess of that of the [CPD]."[16] Charges were filed against Haymarket Protesters and eight labor organizers were found guilty of a litany of charges. During the sentencing hearing, one of the organizers told the court that the CPD was "among the city's worst gangs, ransacking houses and stealing money and watches." Even though the person who threw the incendiary device was never identified, the state of Illinois eventually executed four men for their role in the Haymarket uprisings.

79.     In 1893, the then Governor of Illinois, John Altgeld, pardoned the Haymarket protesters and stated that they were the victims of "hysteria, packed juries and a biased judge." Governor Altgeld also blamed the City of Chicago for failing to hold law enforcement officers accountable for repeated use of lethal force against protesters.[17]

### ii.     1919 Racial Unrest

80.     In 1919, Eugene Williams, a Black teenager, attempted to integrate a Chicago public beach. An angry mob of white people stoned Mr. Williams and he drowned to death in Lake Michigan. When CPD officers arrived on the scene, they refused to arrest anyone in the white mob. Instead, CPD officers beat the Black witnesses who demanded Eugene's murderers be arrested. The fury over the Black teenager's murder was compounded by the CPD's refusal to act and as a result, protests and racialized violence spread throughout the city. CPD responded with its own forms of racialized violence and brutality.

81.     In direct response to these uprisings, on August 20, 1919, then Governor Lowden established the Commission on Race Relations to "report upon the broad question of relations between the two races." The Commission completed its work on December 6, 1921, and issued

---

[16] *Id.*
[17] *Id.*

a 819-page report.[18]  The report concluded that the uprisings were "merely a symptom of serious and profound disorders lying beneath the surface of race relations in Chicago."[19]

82.  Many of the Commissions' findings were a direct indictment of the CPD. Examples of the Commission's findings related to CPD include:

a.  The then State's Attorney testified before the Commission that, in relation to CPD's actions during the uprisings, "There is no doubt that a great many police officers were grossly unfair in making arrests.  They shut their eyes to offenses committed by white men while they were very vigorous in getting all the [Black] men they could get."[20]

b.  Data affirms this conclusion.  Two hundred and twenty nine people were accused of criminal offenses related to the unrest: 154 Black people and 75 white people. But of the 520 injured persons who were identified by race, 342 were Black and 178 were white.  Based on these numbers the Commission concluded that "the fact that twice as many [Black people] appeared as defendants and twice as many were injured as whites suggests the conclusion that whites were not apprehended as readily as [Black people.]"[21]  "The failure of the police to arrest impartially, at the time of the rioting, whether from insufficient effort or otherwise, was a mistake and had a tendency to further incite and aggravate the [Black]

---

[18]  The Negro in Chicago: A Study of Race Relations and A Race Riot. The Chicago Commission on Race Relations. The University of Chicago Press. Chicago Illinois. (Hereinafter "1919 Commission Report") The Commission's findings are well known to this administration.  Prior to becoming Mayor, Lori Lightfoot chaired Chicago's Police Accountability Task Force, a Task Force formed by then Mayor Rahm Emmanuel in the wake of the release of the video depicting Chicago police officer Jason Van Dyke murder Laquan McDonald, a Black teenager.  The Task Force attached the 1919 Commission's findings to its report.

[19]  1919 Commission Report at 602.

[20]  *Id.*

[21]  *Id.* at 34.

population."[22]  "[L]eaders among the [Black community] clearly indicate that discrimination in arrest was a principal cause of widespread and long standing distrust.[23]

c.   The Commission noted a number of "minor tales" that "laid the foundation for Black "bitterness toward white police" including the arrest of a Black man after he had been beaten by white mob, multiple Chicago police officers failing to take action while witnessing white people beat and brutalize Black people, and Chicago police officers arresting, detaining, and clubbing Black people who sought out officers for protection and assistance during the unrest.[24]

d.   During the unrest, CPD's record keeping was "incomplete and inaccurate." "[S]tation lists of injured were far from complete and. . . it was not uncommon to find innocent persons charged with serious offenses."[25]  This shoddy record keeping was particularly problematic, because "many of the deaths and injuries occurred during clashes between white policemen and [Black people]."[26]

e.   The Commission found "general prejudice" among CPD officers and "certain instances" that demonstrated "discrimination, abuse, brutality, indifference and neglect."[27]  These instances include CPD officers who called a Black man who had been beaten by a white mob a n****r and struck him on his head and officers who struck a Black man on his head, threatened to shoot him and then held him

---

[22] *Id.* at 36.
[23] *Id.* at 34.
[24] *Id.* at 34-35.
[25] *Id.* at 37.
[26] *Id.*
[27] *Id.* at 38.

incommunicado for seven days, and a supervisor who demonstrated indifference to the fact that officers under his command shot and killed multiple Black people.[28]

83.     The Commission issued a series of detailed recommendations to the CPD and other City officials, that included the need for a detailed plan to address future uprisings, an end to discriminatory policing, an immediate investigation into reports that Chicago police officers neglect their duties and/or participated in riots and punishment for those officers found guilty of these offenses.[29]

84.     A Grand Jury convened regarding the 1919 unrest concluded that CPD "is need of a thorough house cleaning.  Every officer, no matter what his position is, who fails in his duty should be dismissed."[30]

85.     The CPD failed to implement any of the Commission's recommendations—and it has never cleaned house.

### iii.     CPD's Response to Protests During the Great Depression

86.     During the Great Depression, Chicago residents formed action groups called Unemployment Councils to address the housing crisis facing the City and country.  Their demonstrations in 1931 were often ended in violence and sometimes arrests for distributing literature.  During one eviction protest, CPD shot four Black protesters.

87.     The Memorial Day Massacre of 1937 occurred at a steelworkers' unionization protest.  CPD already incited violence with the group two days before Memorial Day by beating protesters attempting to march to the steel plant, injuring 18 demonstrators.  On Memorial Day,

---

[28] *Id.* at 38-39.
[29] *Id.* at 641.
[30] *Id.* at 51.

police clashed with protesters again marching towards the plant. This time, the steelworkers were met with tear gas and gunfire; the officers were shooting protesters in their back as they fled. As a result, 10 protesters died, at least 60 were wounded, and over 600 people were arrested.

### iv. 1968 Civil Rights Related Uprisings

88.    CPD responded to the 1960's Black Freedom Movement with its now trademark violent and repressive tactics. In 1968, uprisings occurred following the assassination of Martin Luther King, Jr. In response, the CPD first used tear gas on protesters and then was later instructed to use more aggressive action. Mayor Richard J. Daley ordered police to shoot to kill arsonists and shoot to maim or cripple anyone suspected of involvement in property-related crimes.

89.    Police violence against protesters continued throughout 1968, most memorably during the Democratic National Convention. For example, Chicago police officers cornered and tear gassed a large crowd of protesters outside the Conrad Hilton Hotel. This incident was not isolated; numerous reports indicate police would not allow protestors to leave an area—or make it difficult to do so—then police would tear gas the protesters who were trapped. Several other individuals were attacked and beaten with batons by Chicago police officers. In total, over 500 protesters and 100 civilians reported injuries from tear gas.

90.    In response to the Black Freedom and anti-war protests in Chicago and around the country, President Johnson established the National Commission on the Causes and Prevention of Violence through Executive Order 11412. This Commission was responsible for investigating and making recommendations regarding the "causes and prevention of lawless acts of violence in our society . . . and the causes and prevention of disrespect for law and order . . . and of violent

disruptions of public order by individuals and groups."

91.     In its final report, the 1968 Commission compared the response of the CPD to police departments responding to protest elsewhere and concluded that "in Chicago the authorities were restrictive in granting demonstration permits, some of the police, deliberately goaded by verbal and physical attacks of small militant groups, responded with excessive force not only against the provocateurs, but also against peaceful demonstrators and passive bystanders.  Their conduct . . . polarized substantial and previously neutral segments of the population against the authorities and in favor of the demonstrators."[31]

92.     The 1968 Commission detailed how the CPD "without coherent planning . . . clubbed and tear gassed guilty and innocent alike, chasing demonstrators through the streets . . . bystanders who had taken no part in the demonstrations were attacked by police officers. Several media representatives were clubbed and had their cameras smashed [by CPD officers]."[32]

93.     The Commission also likened the CPD's violent response to protesters to white, racist segregationists.  "[P]eople seem to have embraced the idea that . . . violent disobedience is justified for the purpose of achieving a desirable political goal.  This idea found widespread support in the South as the white majority in that region resisted [integration] and some such notion was probably not far from the minds of the Alabama State Troopers when they attacked Dr. King's peaceful demonstration at Selma in 1965.  No doubt it was also prominent in the thinking of the Chicago policemen who administered punishment to the demonstrators in Chicago during the Democratic Convention of 1968."[33]

---

[31]  https://www.ncjrs.gov/pdffiles1/digitization/275ncjrs.pdf at 71.
[32]  *Id.* at 73.
[33]  *Id.* at 92.

94. The Commission did a deep dive into the CPD's reaction to the uprisings in 1968 and issued a special sub report focusing exclusively on Chicago. That report, *Rights in Conflict: the Violent Confrontation of Demonstrators and Police in the Parks and Streets of Chicago during the week of the Democratic National Convention of 1968*, authored by Daniel Walker and referred to as the Walker Report, concluded that CPD responded to the protests with "unrestrained and indiscriminate violence on many occasions," often inflicted upon "peaceful demonstrators, onlookers, and large numbers of residents who were simply passing through, or happened to live in, the areas where confrontations were occurring."

95. The Walker Report further concluded that CPD violently retaliated against journalists and photographers. Chicago police officers warned photographers: "you take my picture, and I'm going to get you." A newspaper photographer described standing in a line with other cameramen when they were charged at by a group of Chicago police officers who "began beating their heads" and "chopping away at the cameras." A network cameraman reported that a CPD officer hit him in the face with a baton and knocked his tooth out. One Chicago police officer yelled "get their fucking cameras" before hitting a cameraman on the head and forcing him to the ground. The CPD's actions intimidated some journalists into discontinuing their coverage. One photographer explained that "I just stopped shooting, because every time you push the flash, they look at you and they are screaming about, 'get the fucking photographers and get the film.'"

96. The 1968 Commission quoted the testimony of a scholar who testified before it and who, prior to his testimony, reviewed the report cited above regarding the 1919 unrest in Chicago and stated "[i]t is a kind of Alice in Wonderland with the same moving picture re-shown

over and over again, the same analysis, the same recommendations, the same inactions."[34]

97.     This same "moving picture" continues to this day—the CPD made no meaningful, sustained change to policy, practice, or procedure in the aftermath of the 1968 uprisings.

### v.    1976-1977 Marquette Park Protests

98.     The CPD's violence against protesters for racial justice continued into 1976.  During June of 1976, members and supporters of Dr. Martin Luther King, Jr. Movement, Inc. ("King"), a not-for-profit aimed at obtaining equal opportunities for all people, marched in Black communities on the Southside of Chicago undisturbed by CPD.  When, however, protesters marched in Marquette Park, a predominantly white neighborhood, between June 8 and June 12, Chicago police officers unlawfully arrested many protesters.

99.     On July 17, 1976, when protesters marched against racism in Marquette Park, they were met by violent bystanders who "hurled rocks, bottles, bricks and explosives at them," and many were injured as a result.  However, despite a court order requiring the CPD to provide adequate protection to the protesters, the CPD refused to apprehend the violent bystanders and conspired to incite violence against the protesters.

100.    The following year on July 23, 1977, Black motorists protested against housing discrimination in Marquette Park after three homes purchased by Black residents in the neighborhood were bombed.  Protesters were met by violent bystanders who threw rocks and bottles at them, and one family was taken to the hospital after their vehicle was stoned.  Despite having a permit to protest in Marquette Park, several protest leaders were arrested by the CPD.

### vi.    CPD Violence Against Protesters Continued into the 1990s

101.    The CPD's violence against protesters continued into the 1990s.  On April 10,

---

[34] *Id.* at 117.

1990, students and parents gathered at Morrill Elementary School to protest the firing of the school's Latinx principal. White CPD officers screamed racial slurs at the protesters, chased them, and used brutal force against them. Chicago police officers injured 14 children who required medical treatment as a result of the officers's abuse.

102.    On April 23, 1990, the AIDS Coalition to Unleash Power ("ACT-UP") organized thousands to converge on downtown Chicago to protest the exclusion of women from the Cook County Hospital AIDS ward and the lack of funding for AIDS research and people living with AIDS. Chicago police officers donned rubber gloves in a hysterical and misguided attempt to avoid contracting AIDS, while they brutalized protesters by pushing, shoving, tackling, and throwing arrestees to the ground. Skittish police horses stepped on protesters and a legal observer was falsely arrested.

103.    On December 29, 1990, protesters speaking out against the Gulf War gathered near the Aragon Ballroom in the Uptown neighborhood of Chicago, following a concert by musical acts Public Enemy and Sonic Youth. Plain-clothed Chicago police officers were witnessed striking protesters in the face, placing them in choke-holds, and conducting false arrests against bystanders opposing their conduct and concert-goers simply leaving the venue.

104.    On June 24 1991, ACT-UP again brought thousands to Chicago targeting the American Medical Association and its national convention at a downtown hotel. In front of the hotel, Chicago police officer Rex Hayes reached through the police line and hauled a protester through the line and onto the cement, punching the protester in the face as he lay defenseless on the concrete. The protester was falsely charged with attempting to disarm a police officer which was revealed by video footage to be a false allegation. Officer Hayes, who had multiple civilian complaints against him, was dubbed the "million dollar man" due to the amount of money the

City had to pay out to victims of his misconduct and was eventually fired.  Hayes' victim and a dozen other ACT-UP activists who suffered serious injuries including bruises and contusions, a fractured wrist, and head injuries all filed excessive force lawsuits, which were settled by the City for substantial money damages.

105.     In August of 1996, activists protesting outside the Democratic National Convention were falsely arrested and injured by Chicago police officers.  More than half a dozen plaintiffs brought an excessive force and false arrest lawsuit that was settled by the City for substantial money damages.

### vii.     Anti-War Protests in the 2000s

106.     CPD continued its illegal and unconstitutional policies and practices of violating protesters' rights into the 2000s.

#### a.  Mass Arrest at the March 20, 2003 Anti-Iraq War Demonstration

107.     On March 20, 2003, a mass demonstration and march against the War in Iraq began at the Federal Plaza in Chicago, Illinois.  Towards the end of the demonstration, Chicago police officers trapped over 800 protesters and by-standers on Chicago Avenue between Michigan Avenue and Mies Van Der Rohe Way without giving people orders to disperse and opportunities to leave.  Chicago police officers, clad in riot gear and holding batons, stood shoulder to shoulder in lines and prevented the marchers and others from leaving the area, despite numerous requests by individuals to do so.

108.     With the consent of Chicago Police Superintendent Terry Hillard, Chicago police officers mass arrested all detained, leading to over 500 people taken to police stations.

109.     After 500 people were handcuffed and taken into police custody, CPD Command Personnel allowed the remaining people to leave.  Before they could do so, people were

compelled by the Chicago police officers to abandon their banners, signs, and other protest paraphernalia, and walk single file with their hands raised in the air through a gauntlet of officers. In some instances, people's bags were searched before they could leave the area.

110. In addition to confining, ensnaring, and arresting the crowd, Chicago police officers engaged in excessive force which included storming into the crowd and striking people with batons. Several women were assaulted after they sat down on the ground to indicate to the CPD that they were peaceful and non-violent. One of the protesters spoke out, condemning an officers' egregious use of force. In retaliation, Chicago police officers brutally arrested him by striking him in the face and breaking his nose. Others individuals were intentionally handcuffed too tightly with the plastic flex cuffs which caused many wrist injuries and pain.

111. Of the 500-plus people taken into custody, 224 were subsequently released without charges because the CPD could not specifically identify who arrested them.

112. The more than 300 arrested who remained were formally charged with one count of Reckless Conduct, a class A misdemeanor under Illinois law, based on a fictional set of allegations. The CPD alleged the crimes committed by the purported males in the crowd were wholly disparate from the crimes allegedly committed by purported females arrested in the exact same area.[35]

---

[35] For the "males," the boilerplate police narrative in virtually identical arrest reports was:

> The above subject was arrested for Reckless Conduct in that he endangered the bodily safety of citizens by acting in such a reckless manner so as to disrupt vehicular and pedestrian traffic. The defendant acted with total disregard for the personal safety of motorists and pedestrians.

For most "females," the following boilerplate narrative was used:

> The above subject along with 1000s of persons endangered the safety of others in that they blocked access to the fire station, positioned themselves in front of the water pumping station and blocked access to the emergency entrance to Northwestern Hospital and refused to leave the area after being ordered to do so by the police.

113.    Those taken in police custody were held somewhere between 10 and 30 hours, and in a few cases up to 40 hours at police stations.  People in police custody were trapped in overcrowded cells; many were denied food, medical treatment, or personal hygiene items; and the CPD refused to let many of the protesters make or receive calls.

114.    A federal civil rights class action was filed against the City of Chicago, Chicago Police Superintendent Hillard, and other CPD personnel alleging that those arrested were seized in violation of their rights to free speech, assembly, and liberty guaranteed by the First, Fourth, and Fourteenth Amendments and Illinois law, and that the City of Chicago was liable under *Monell v. N.Y.C. Dept. of Soc. Serv.* 436 U.S. 658 (1978).  Additionally, claims for excessive force, battery, and the denial of adequate medical care were brought on behalf of seven individual plaintiffs.

115.    The Seventh Circuit, in a unanimous opinion, ruled in favor of the Class plaintiffs, denying the City and Chicago police defendants summary judgment on plaintiffs' constitutional claims.  *See Vodak v. City of Chicago*, 639 F.3d 738, 745-746 (7th Cir. 2011).  The Court's opinion was sweeping in nature, affirming the rights of all protesters to engage in spontaneous demonstrations.  The Court found:

> The police were numerous, in riot gear, and formidable.  The crowd was just milling about, predominantly peaceably (the defendants do not agree that the crowd was peaceable, but this is a disputable and disputed contention; it cannot be confirmed without a trial) . . . What they [police] could not lawfully do, in circumstances that were not threatening to the safety of the police or other people, was arrest people who the police had

---

The evidence established these allegations lodged against the protesters were patently false.  There was no emergency room entrance to Northwestern Hospital on Chicago Avenue.  Moreover, video taken by the CPD did not depict women actively blocking any of the enumerated buildings or refusing orders to disperse as alleged.  Instead, CPD video supported the arrestees' allegations that people were trapped in the bounded area and that many were asking, even begging, Chicago police officers for the opportunity to leave the area, and that they were refused the opportunity to do so.

no good reason to believe knew they were violating a police order.

*Vodak*, 639 F.3d at 745-746.  The Court further found that the minor misconduct committed by a few in the demonstration could not justify the mass arrest of hundreds, thereby implicitly upholding the right of protesters and others at a demonstration to be free from an arrest that is not predicated upon individual, particularized probable cause of criminal conduct, in conformity with precedent from across the country.  *Id*. at 746.

116.    After the Seventh Circuit remanded the case to the District Court, the entire case was settled and resolved.  Ultimately, the case cost the taxpayers of the City of Chicago approximately $15 million, with the plaintiffs receiving over $6.4 million in settlement awards.  Around $9 million was paid to attorneys for the plaintiffs and outside counsel hired by the City to defend the CPD and City in fees and costs.

117.    The day the settlement was disclosed to the public, the CPD Superintendent, Garry McCarthy, acknowledged "important lessons" the CPD learned from *Vodak* about dealing with large groups of protesters, including the need to provide individuals with orders to disperse and opportunities to leave.   A City spokesperson also claimed that the City has greatly improved its crowd-control methods by incorporating what was learned from the 2003 protest and subsequent litigation and settlement.

### b.  August 17, 2011 Anti-Deportation Demonstration

118.    On August 17, 2011, protesters and legal observers gathered in Chicago for an anti-deportation demonstration.  CPD officers hit two legal observers in the face and falsely arrested the legal observers after they attempted to assist a young woman and child that had been battered by a CPD officer.

### c.  Demonstration Against Trump in 2016 at UIC

119.    On March 11, 2016, Presidential candidate Donald Trump decided to hold a

36

political rally at the University of Illinois at Chicago (UIC) Campus.

120.    A number of student-led groups and Black Lives Matter - Chicago, held a counter demonstration and march on and near the campus in response.  The purpose of the counter demonstration was to stand up for racial and religious equality, immigrant rights, and women's rights.

121.    The demonstration was monitored and surveilled by the CPD.  At some point the CPD created a blockade at one end of the march stopping its movement.  The CPD also blocked off several streets severely impeding people's ability to leave the demonstration

122.    Members of the CPD used their batons to push demonstrators and individuals in the crowd.

123.    Several individuals were physically attacked and four were falsely arrested by CPD members.

124.    One of the people attacked included a 45-year-old white woman, who verbally protested the police ramming a baton into her daughter.  A Chicago police officer grabbed the woman by the hair and threw her to the ground.  While on the ground, without legal justification, CPD officers kicked the woman on her body and beat her multiple times on her head and body with their batons.  She was struck in the head with a baton causing blood to drip down her face. An officer also called her a "cunt."  As a result of the vicious beating by these Chicago police officers, this woman suffered numerous physical injuries, including multiple deep bruises all over her body, a large contusion to her right hand, and a large laceration to the top of her scalp requiring emergency medical treatment resulting in the use of staples to close the wound in her head. In an attempt to cover up their egregious misconduct, these Chicago police officers sought approval to lodge felony charges against her making false allegations that she attacked an officer.

After the felony review State's Attorney and Chicago police Detective reviewed the file, they both declined to authorize felony charges and recommended she be released without charges. One of the officers, nevertheless, chose to bring a misdemeanor charge against her for battery despite the lack of probable cause to do so. This case was ultimately dismissed and she successfully sued the Chicago police officers and City settling her lawsuit for $248,000.

125.    Another person attacked was Sopan Deb, a member of the press who was covering the Trump rally. Without any warning, a Chicago police officer grabbed him from behind and threw him to the ground. The officer then placed his boot on Mr. Deb's neck while conducting the arrest. Mr. Deb sustained scratches to his chin. Mr. Deb clearly identified himself as a member of the press during and after the arrest. Mr. Deb was falsely charged with resisting arrest, and taken into police custody, but the charges were subsequently dropped by the Chicago and Illinois state police. Footage capturing Mr. Deb's arrest clearly shows Mr. Deb cooperating with the arresting officer as opposed to resisting the officer. None of the officers involved faced any disciplinary consequences.

126.    CPD's policies and practices of using excessive force and abuse tactics against protesters continued through the Summer of 2020, as detailed above. CPD continued to engage in these abuse and unconstitutional tactics despite being under a Consent Decree that compels policy and practice reform.

**B.    CPD Officers Freely Express Animus Against Protesters with Impunity**

127.    In 2015, the United States Department of Justice ("DOJ") documented the racist, biased, and anti-protester views held by many Chicago police officers who often express discriminatory views on social media. One officer posted two graphic photos of slain Black men with the caption: "Hopefully one of these pictures will make the black lives matter activist

organization feel a whole lot better!"  The DOJ found that supervisors posted many of the discriminatory posts it analyzed.  A more recent review of the same popular CPD social media accounts and blogs reveals CPD's animus towards protesters, Black and brown people remains unchanged.  For example, on Second City Cop,  a popular police blog, a commenter posted: "I have already canceled 1 monthly subscription to a supplement company due to their Social Justice Warrior-Virtue Signaling-BLM Pandering email they felt compelled to send me to illustrate their 'woke-ness.'  It's time to start using these Communists rules of engagement against them.  I purchase a product for the product, not to receive political rhetoric about the values of BLM (founded by two Black female Marxists).  No thanks!  I'll spend my money with companies not afraid to speak the truth, if there are any left."

128.     Another commenter on the same blog writes: "If I am ever in an outdoor restaurant and some agitator starts with a megaphone shouting 'Say her name' or some other nonsense I am going to shove it up their ass.  This is what it comes down to, normal everyday citizens saying 'enough.'  The days of fearing the retribution or being doxed on the internet is over.  Stand up.  Down be cowered by the mob.  Once they start to see were [sic] not going to take it anymore and a few of these wannabe 60s radicals loses a few teeth, they will start to think twice.  Go to your next Support the Blue Rally.  Put that We Support Our Police Officer signs in your window.  Don't be afraid.  Stand up to this mob.  Support the blue."

129.     Second City Cop's twitter posts also reflect the CPD's hatred of protesters and specifically for Black Lives Matter protesters.  The Second City Cop tweets pictured below advise violence against protesters, mock the movement, and laud Kyle Rittenhouse as a model citizen.  Rittenhouse is the Illinois teenager who traveled to Kenosha, Wisconsin, where he shot three Black Lives Matter protesters, killing two.  He is now facing homicide charges and attempt

homicide charges for those shootings.





## C. CPD's Widespread Practice of Excessive Force

130.     The CPD's violence and brutality against protesters is consistent with the

Department's widespread policy and practice of using aggressive tactics that unnecessarily

escalate encounters with individuals, increase tensions, and lead to excessive force.  The CPD

also fails to de-escalate encounters when it would be reasonable to do so.  Even where some use

of force may be justified, officers, as a matter of practice, use a higher level of force than is

objectively reasonable.  CPD's violence against protesters—and particularly against protesters

who stand in opposition to police violence, corruption, and racism—is an extension of CPD's

long standing, widespread practice of excessive force.  This widespread practice of violence has been documented and acknowledged by the DOJ, the Chicago Police Accountability Task Force (the "Task Force"), the federal courts, civil rights activists, City officials—including the Mayor and Superintendent of Police—and, above all, by the Black communities most targeted by CPD for violence and abuse.

131.    In April 2016, the Task Force released a report about the system of training, accountability, and oversight of CPD officers (the "Task Force Report").  It found: "The community's lack of trust in CPD is justified.  There is substantial evidence that people of color—particularly African-Americans—have had disproportionately negative experiences with the police over an extended period of time.  There is also substantial evidence that these experiences continue today through significant disparate impacts associated with the use of force, foot and traffic stops and bias in the police oversight system itself."

132.    The Task Force reported that racial bias in the CPD was "not a thing of the past." Instead, "data establishes that CPD's use of force disproportionately affects people of color.  The same is true for foot and traffic stops.  These enforcement actions have deepened a widespread perception that police are indiscriminately targeting anyone and everyone in communities of color without making individualized determinations of reasonable suspicion of criminal conduct. Racial bias extends to other areas as well, including the police oversight system itself."

133.    In 2015, the Department of Justice, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's Office for the Northern District of Illinois jointly initiated an investigation of the CPD and the accountability body charged with overseeing the police—the Independent Police Review Authority ("IPRA").  This investigation was undertaken to determine whether the CPD was engaging in a pattern or practice of unlawful conduct and, if so, what

systemic deficiencies or practices within the CPD, IPRA, and the City constituted this pattern or practice.  The DOJ investigation assessed the CPD's use of force, and addressed CPD policies, training, reporting, investigation, and review related to officer use of force.

134.    In January 2017, the DOJ finished its investigation and released its findings (the "DOJ Findings Report").  In accordance with the allegations herein, the DOJ Findings Report concluded that "CPD officers engage in a pattern or practice of using force that is unjustified, disproportionate, and otherwise excessive  . . . CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD."

135.    Based on its review of complaints, the DOJ determined that uses of force by the CPD "were not aberrational."  Instead, "our holistic review of this information, combined with our investigation of CPD's training, supervision, accountability, and other systems, give us reasonable cause to believe that the unreasonable force we identified amounts to a pattern or practice of unlawful conduct."

136.    The CPD's pattern or practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat.  According to the DOJ, the use of unreasonable force to quickly resolve non-violent encounters is a recurrent issue at CPD.

137.    The CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force.  The CPD also fails to de-escalate encounters when it would be reasonable to do so.

138.    The DOJ observed this trend of escalation in shootings, finding that CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable

uses of force and resulting harm, including deaths." The DOJ also reported that CPD officers regularly use retaliatory force against people who object to being stopped, without cause.

139. In one incident recorded by the DOJ, officers forcibly brought a man to the ground because he stiffened and locked his arms while they were arresting him for walking his dog without a leash and refusing to present identification. Officers provided no justification for the level of force they used. They failed to explain why they did not attempt to resolve the situation with common (and common sense) de-escalation techniques.

140. The Task Force similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong." The Task Force acknowledged widespread reports from Chicagoans that officers approach "routine situations with an overaggressive and hostile demeanor, using racially charged and abusive language."

141. The DOJ investigation and the Task Force findings directly resulted from the uprisings that occurred in the aftermath of the 2015 release of the video depicting CPD Officer Jason Van Dyke murder Black teenager Laquan McDonald. Some of the groups that provided foundation, leadership, and support for these uprisings, including Black Lives Matter-Chicago, filed a lawsuit seeking a consent decree that would govern CPD operations and prevent future abuse and racialized violence and won the right to enforce the Consent Decree that ultimately resulted from litigation filed by the Illinois Attorney General.[36] Even though the Consent Decree contains a number of provisions that should have remedied the policy and practice violations described in this Complaint, as described fully below, CPD has entirely failed to conform its practices to Consent Decree mandates.

---

[36] Organizations represented by the ACLU of Illinois and the Attorney General of the State of Illinois later filed their own lawsuits and eventually, these efforts resulted in a Consent Decree that has been in effect since April 2019.

### D.     The CPD Has Wholly Disregarded Consent Decree Requirements

142.     An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports.  (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.)  The IMT has so far issued two reports with a clear trend across both: the City and CPD have failed to comply with the reform schedule.  In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree.  The City and CPD missed 37 of 50 deadlines.  The City's record in the second report was no better.  In that report, filed on June 18, 2020, the City and CPD missed 52 of 74 deadlines.

143.     The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the recent protests.  CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

144.     In its First Report (1:17-cv-06260 "Report 1") filed on November 15, 2019, the IMT described the CPD's consistent failures across the assessed paragraphs of the Consent Decree.  In terms of impartial policing, ¶ 58 requires that the CPD establish a policy to permit "members of the public to photograph and record CPD officers in the performance of their law enforcement duties."  CPD failed to meet any level of compliance with the paragraph or the corresponding deadline in the Consent Decree.  Even so, the IMT described the ¶ 58 policy as "necessary" given CPD unwillingness to be photographed.  (Report 1 at 50.)  Furthermore, the CPD refused to allow for community engagement in the creation of the draft policy, which is a requirement of the Consent Decree.  *See* ¶ 52.

145.     In terms of use of force, CPD missed 16 out of 19 deadlines, and failed even preliminary compliance for 19 out of 25 Consent Decree paragraphs.  CPD did not achieve secondary or full compliance in any paragraphs concerning use of force.  CPD's use of force failures break down into policy and reporting deficits.  When reviewing the CPD's approach to use of force generally, the IMT explicitly recommended that "the CPD provide more detailed examples of various de-escalation techniques in each policy, rather than rely on the boilerplate language that is at the front end of each policy."  (Report 1 at 85.)

146.     The Consent Decree requires that every two years, the IMT conduct a reliable, representative, and comprehensive survey of broad cross sections of Chicago's communities.  The most recent survey, released in August 2020, reveals that community members are well aware of CPD's failures to comply with the Consent Decree requirements.  Less than half of people surveyed believe that CPD generally uses forces appropriately or adequately de-escalates situations.

147.     The Consent Decree provisions related to the allegations in this Complaint include a number of provisions, that, if meaningfully implemented by the CPD prior to the Summer 2020 uprisings, were intended to prevent the injuries detailed in this Complaint.  These provisions include the following requirements and prohibitions:

     a.   Chicago police officers must not use impact weapons (e.g., baton, asp, improvised impact weapons) to intentionally strike a subject in the head or neck, except when deadly force is justified.

     b.   When safe and feasible to do so, Chicago police officers must give verbal commands and warnings prior to, during, and after using an impact weapon.

     c.   Chicago police officers must receive training on proper use of an impact weapon

46

before being permitted to carry such a weapon.

d.  Chicago police officers must request appropriate medical aid for a subject who experiences an impact weapon strike when the subject appears to be in any physical distress or complains of injury, or when the subject sustained a strike to the head from an impact weapon or a hard, fixed object.  Chicago police officers must render life-saving aid to the subject consistent with the officers' training until medical professionals arrive on scene.

e.  Chicago police officers may only use force for a lawful purpose.  Chicago police officers are prohibited from using force as punishment or retaliation, such as using force to punish or retaliate against a person for fleeing, resisting arrest, insulting an officer, or engaging in protected First Amendment activity (e.g., lawful demonstrations, protected speech, observing or filming police activity, or criticizing an officer or the officer's conduct).

f.  The CPD will clarify in policy that Chicago police officers will permit members of the public to photograph and record Chicago police officers in the performance of their law enforcement duties in a public place, or in circumstances in which the officer has no reasonable expectation of privacy.

g.  Chicago police officers will allow individuals to voluntarily comply with lawful orders whenever safe and feasible (e.g., allowing individuals the opportunity to submit to arrest before force is used).

h.  Chicago police officers may only use OC devices for crowd dispersal when such force is necessary, objectively reasonable, and proportional to the threat presented to public safety.  CPD will continue to require that the Superintendent or his or

her designee provides authorization before OC devices are used for noncompliant groups, crowds, or an individual taking part in a group or crowd.

i.  The CPD will require that all Chicago police officers interact with all members of the public in an unbiased, fair, and respectful manner. The CPD will require that officers refrain from using language or taking action intended to taunt or denigrate an individual, including using racist or derogatory language.

### E.  The CPD's Widespread Code of Silence and Failure to Discipline Abusive Officers

148.  The CPD has maintained its widespread practice of excessive force for well over 100 years through promoting the "code of silence" and the failure to discipline Chicago police officers trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing. Any officer who violates this code is penalized by the CPD.

149.  Police officers are educated at the CPD about the tenets of this code of silence. They are instructed: "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

150.  In *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

151.  In December 2015, in a speech to Chicago aldermen, Mayor Emanuel acknowledged that Chicago police use a "code of silence" to conceal abuses and wrongdoing by

their colleagues.

152.     In April 2016, the Task Force found that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

153.     The DOJ investigation confirmed that the code of silence pervades the CPD: "City, police officers and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."  One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street."  The code of silence extends, as the DOJ found, to sergeants and other supervisors who take affirmative actions to cover up the misconduct of their subordinates.

154.     The DOJ determined that the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth."  This is because "officers do not believe there is much to lose by lying."

155.     The CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including the Defendant Officers.  Consequently, the City allows its officers to believe they can abuse and violate the rights of individuals without consequence.  These policies, practices, and customs directly contribute to the code of silence.

156.     According to the Citizens Police Data Project, between 1988 and 2020, only 3% of all complaints that CPD officers engaged in excessive force resulted in any discipline for the officer and only 1% of complaints related to First Amendment violations resulted in discipline. The DOJ reported that in the rare instance where a complaint of misconduct was sustained, "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter

misconduct."

157.     Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without penalty.  From 2007 to 2015, more than 1,500 Chicago police officers acquired ten or more Complaint Registers ("CRs").  Sixty-five of these officers had 30 or more CRs.  These numbers do not reflect the entire disciplinary history (e.g., pre-2007) of these officers.  They also underreport the problem.  While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited.

158.     Given the lack of effective review or discipline, officers often use the same or similar language to justify their use of force.  As the DOJ determined: "We saw many instances where officers justified force based on a boilerplate description of resistance that provides insufficient specificity to understand the force used or resistance encountered."  The CPD regularly accepts such insufficient documentation without question, even when an officer's use of force is suspect or gives rise to a formal complaint.

159.     Despite this seemingly facetious tweet stating that the Summer 2020 protests would result in a large number of tactical response reports (the forms Chicago police officers are required to complete to document uses of force), during the recent protests, Chicago police officers relied on the code of silence and routinely failed to complete this required documentation—even when Chicago police officers unlawfully used lethal force against protesters in full view of their supervisors.



160.    While a number of Consent Decree provisions aim to eliminate the code of silence, the CPD has failed to comply with these terms.  IMT reports overarching concerns about the entire complaint process.  Specifically, the CPD failed to implement a policy in which the public knows how to submit complaints and that they may do so in multiple ways (¶¶ 425-26).  The IMT found that, for anyone looking for more information on filing complaints, the reporting page and helpful resources are hard to find.  The CPD reporting website is not user friendly, especially for non-English speakers.

161.    Furthermore, the CPD failed to ensure that officers who report misconduct receive protection (¶ 436).  The CPD also failed to create a written policy detailing how complaints will be transferred to the Accountability Sergeant (¶ 457).  The draft policy the CPD created "does not specifically address why, when, or how an investigation will be transferred." Further, the CPD has failed to support the implementation of a "completely anonymous, double-blind safe

space portal" developed by the Officer of Inspector General, Joseph Ferguson. The portal

intended to facilitate anonymous complaints from Chicago police department officers, but

CPDhas failed to take the actions necessary to ensure that it is used to defeat the code of silence.

162.    In the Second IMT Report (1:17-cv-06260), filed June 18, 2020, the CPD

continued its pattern of systematic non-compliance with the assessed paragraphs of the Consent

Decree.  The CPD's failures relate directly to the abuses witnessed at the recent protests.

### F. Governmental Reports and an Investigation by the Federal Consent Decree Monitor Document CPD's Widespread Policy and Practice Violations During the 2020 Uprisings

163.    In February 2021, the Chicago Police Department released a 26-page report: *After*

*Action Report: The Chicago Police Department's Response to Civil Unrest between May 29,*

*2020 and June 12, 2020.*[37]  CPD's After Action report failed to address many of the obvious

policy and practice failures identified throughout this complaint (including but not limited to the

use of lethal force against peaceful protesters).  However, in this report, the CPD makes a

number of key admissions about its failed response to the 2020 uprisings.  Those admissions

include:

　　　　i.  CPD officers were not prepared to respond to "large-scale, unplanned

　　　　　　incidents."[38]

　　　　ii.  CPD's training failed to prepare newer officers for wide scale protests and

　　　　　　CPD officers failed to comply with existing policies regarding mass

　　　　　　arrests.[39]

---

[37] *After Action Report: The Chicago Police Department's Response to Civil Unrest between May 29, 2020 and June 12, 2020,* THE CHICAGO POLICE DEPT. (February 2021)  https://home.chicagopolice.org/wp-content/uploads/2021/02/AAR_FINAL_2-4-21.pdf (hereinafter "CPD After Action Report").
[38] *Id.* at 5.
[39] *Id.* at 6, 9.

      iii.   CPD officers were deployed to respond to the protests without any

           "specific plans"—a decision the CPD calls "ineffective."[40]

      iv.   "[S]ome Department members were observed during the Events with their

           names and/or badges removed from their uniforms or otherwise obscured

           in violation of Department policy."[41]

164.    The CPD's After Action report is also important for what it omits. For example, it failed to note CPD officer's well documented policy violations relating to batons and other uses of force.[42] The report also fails to mention the physical and emotional trauma protesters described during federal court proceedings—yet it described in some detail the harm suffered by the business community.[43] The report notes that in the wake of the 2020 uprisings, the CPD secured donations of 1,650 ballistic helmets with Kevlar protection and laser beam reflections that will protect officers from "blunt trauma."[44] Yet it is silent about any concrete action the CPD plans to take to protect protesters from further harm at the hands of CPD officers.

165.    Also in February 2021, the Officer of the Inspector General for the City of Chicago released a Report on Chicago's Response to George Floyd Protests and Unrest.[45] That report was based on "thousands of documents" and more than 70 interviews conducted with

---

[40] *Id.* at 8.

[41] *Id.*

[42] Both the Inspector General and the Independent Monitor detail CPD's force-related violations making CPD's own omission all the more troubling. *See also Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021) https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf ("Many participants and observers who gave testimony after these events described dangerous baton strikes and other reportable uses of force that are not reflected in CPD's reported data. CPD's after-action report does not acknowledge and does not attempt to rebut these claims.").

[43] CPD After Action Report, at 6.

[44] *Id.* at 14.

[45] *Report on Chicago's Response to George Floyd Protests and Unrest,* CITY OF CHICAGO OFFICE OF INSPECTOR GENERAL, 15 (February 18, 2021) https://igchicago.org/wp-content/uploads/2021/02/OIG-Report-on-Chicagos-Response-to-George-Floyd-Protests-and-Unrest.pdf (Hereinafter "OIG Protest Report")

CPD officials.[46]  The OIG Protest Report also relied upon testimony from protesters provided during federal court proceedings, arrest reports, and an analysis of over 100 hours of body worn camera footage.[47]  Based on this information, the OIG made the following findings:

i. CPD made more than 1,500 related arrests between May 29 and June 7, 2020. The OIG documented that CPD failed to train officers on mass arrest procedures and held protesters "without proper documentation" and "threatened" the safety of protesters through lengthy delays in transportation and processing.[48]  The report further describes CPD's arrest related records as "uneven and incomplete."[49]

ii. CPD officers detained protesters for prolonged time periods: "on average, arrestees were detained for a total of 14.0 hours.  The briefest total detention time recorded was 1.2 hours and the longest was 53.3 hours."[50]

iii. The OIG Protest Report contains extensive documentation regarding CPD's failures to "fulfill its force reporting obligations" and to "provide clear and consistent guidance to officers on reporting obligations."[51]  The report notes that there was significant confusion among "CPD's highest ranks" and "rank and file" members about the reporting requirements during the uprisings.  As a result, "CPD underreported uses of baton strikes and manual strikes, further resulting in an inadequate record of

---

[46] *Id.* at 6.

[47] *Id.* at 7.

[48] *Id.* at 9.

[49] *Id.*

[50] *Id.* at 91.

[51] *Id.* at 9.

severe and potentially out of policy uses of force."[52]

iv. Superintendent Brown provided CPD officers with a general authorization for the use of OC spray when he considered "looting and violence" to be widespread throughout the city.[53] He further authorized the use of OC spray during "situations involving large crowds acting as non-compliant groups, active resisters and assailants."[54]

v. On May 30, Mayor Lori Lightfoot herself authorized the use of O.C. spray against protesters at Trump Tower, many of whom were peaceful protesters.[55]

vi. Despite these relatively limited authorizations, CPD officers reported that they used OC spray on peaceful protesters, including in efforts to "move protesters off the bridges" and "to slow down the movement of protesters through the city."[56]

vii. The OIG report also documented that CPD's SWAT team deployed OC spray against crowds 85 times on May 30, 2020.[57] However, because of the lack of accurate reporting, CPD officers used personal OC spray (and failed to report it) on far more occasions.

viii. The OIG Protest Report further describes how CPD exempted from review force the CPD officers used during the uprisings. None of the CPD

---

[52] *Id.*
[53] *Id.* at 108
[54] *Id.* at 109.
[55] *Id.*
[56] *Id.*
[57] *Id.* at 49.

officer's uprising force was reviewed by the Force Review Division, which conducts internal and non-disciplinary reviews of force in order to ensure "reporting obligations are met" and to identify "tactical, equipment or policy concerns."[58] As a result, CPD officer use of force during the uprisings was not subject to any meaningful accountability process. The report further notes that multiple reports documenting mass use of OC spray at different locations contained identical language justifying the use OC spray.[59] The use of boiler plate language to justify CPD officer use of force against different people in different locations further demonstrates the complete breakdown of reporting and force related accountability processes.

ix. The OIG Protest Report describes other forms of CPD violence during the uprisings. Specifically, the report documents that "protesters reported seeing and experiencing apparently indiscriminate uses of force by CPD members. They describe seeing CPD members tackle, punch and use batons to strike peaceful protesters in the head and neck."[60]

x. CPD policy restricts the circumstances under which officers can use baton strikes, yet despite the existence of this policy the OIG found evidence of widespread policy violations during the uprisings.[61] Under CPD policy, baton strikes to the head are considered lethal force and can only be used

---

[58] *Id.* at 110.
[59] *Id.* 111.
[60] *Id.* at 37.
[61] *Id.* at 95.

against people attempting to harm CPD officers.  The OIG documented that CPD officers both failed to accurately report these instances of lethal force and that "reports from community members who participated in the protests suggest that CPD members' use of batons was both substantially more widespread and more dangerous than indicated . . . by officers."[62]

xi.  The OIG Protest Report describes how, given CPD's reporting failures, it is difficult to specifically quantify the number of protesters who were subject to lethal force by CPD officers, but notes that community member and protesters provided compelling narratives of this widespread policy violation. ". . .[C]ommunity members. . . describe multiple instances of baton strikes.  One community member reported seeing people beaten with batons at the protests "tens of times."  Another described seeing someone beaten "on the ground while handcuffed."  The testimonials in court included descriptions of protesters beaten with batons "until they were bleeding," and protesters struck with batons in response to minor provocations by someone else (e.g., the throwing of a water bottle).  Ghian Foreman, President of the Chicago Police Board, gave a public statement that he was "a victim of police aggression" when he was struck five times in the legs with batons while walking through the scene of a protest."[63]

xii.  The OIG Protest Report notes that on May 30, 2020, "CPD officers used their batons to push protesters off the bridge onto Lower Wacker Drive.

---

[62] *Id.* at 113
[63] *Id.* at 114.

Accounts from protesters on the bridge note that they did not hear a dispersal order before officers began to push them with batons. . . During the push, protesters described being beaten with officers' batons, punched, and kicked as CPD tried to clear the bridge"[64]

xiii. The OIG report includes summaries of body worn camera footage that further documents the policy and practice violations that give rise to the Plaintiffs' claims.  Including:

   a.  During one incident, body worn camera depicts CPD officers ignoring a protester who requested seizure medication.  After the protester had an apparent seizure in a CPD vehicle, and while observing the protester lying face down in the vehicle, the CPD officer was captured on video saying  "chick's having a seizure I guess."  The officer notes the protester is apparently breathing and states that nothing else can be done.[65]

   b.  A CPD officer is recorded as saying to a passive protester "I will tase you if you move, do you hear me?"[66]

   c.  A CPD officer called a protester a "little bitch" after they complained about pain.[67]

   d.  A CPD officer was recorded telling other officers that he

---

[64] *Id.* at 41.
[65] *Id.* at 51.
[66] *Id.* at 51.
[67] *Id.*

58

made a protester cry by telling them they would be raped in jail given their small size.[68]

e. A CPD officer was recorded hitting a protester three times on the head while the protester was laying face down on the floor. These strikes included punches to the head and neck area.[69]

xiv. The OIG Protest Report describes how CPD's operational response to the protests "crippled the accountability processes from the start."[70] The accountability process was defeated by CPD's failure to ensure that all officers had functioning body warn cameras and CPD officers' "obscuring their badge numbers and nameplates" during the protests.[71]

166. In July 2021, the Independent Monitor Team (IMT) responsible for overseeing the City's compliance with the consent decree governing CPD operations issued a 464-page report that addresses the City's and the CPD's "response to protest and unrest under the consent decree."[72] That report contains the following findings:

i. The IMT Protest Report describes hearing "from many community member who expressed new fears, frustration, confusion, pain and anger regarding their experiences with officers during protests."[73] Protesters describe to the IMT how CPD officers verbally abused them, pushed and

---

[68] *Id.*

[69] *Id.* at 114.

[70] *Id.* at 9.

[71] *Id.* at 10.

[72] *Illinois v. City of Chicago*, 17-CV-6260, 6 (N.D. Ill. 2021) (Special Report: The City of Chicago's and the Chicago Police Department's Responses to Protest and Unrest Under the Consent Decree) (Hereinafter "IMT Protest Report").

[73] *Id.* at 12.

shoved them, tackled them to the ground, pulled their hair, struck them with batons, fists, or other objects and sprayed them with pepper spray. Protesters also described enduring physical and mental and emotional injuries as result of CPD's violent, abusive conduct, including head injuries and ongoing emotional trauma.[74]

ii. The IMT Protest Report further concluded that CPD and the City did not have the "polices, reporting practices, training, equipment, data analysis, community engagement or inter agency coordination required to respond effectively" to the protests.[75]

iii. The IMT Protest Report documented that "some officers engaged in various levels of misconduct and excessive force."[76] The IMT also reports that because of CPD's officers' failure to wear body cameras and comply with reporting requirements "the actual number of use of force incidents may be unknowable, including how often O.C. spray was used."[77]

iv. The IMT described how CPD officers were "deployed without their equipment" including body worn cameras.[78] "According to CPD, there were at least 5,676 officers who responded to protests and unrest between May 1, 2020, and August 12, 2020, without body-worn cameras. The IMT described how "supervisors instructed [officers] to not have the cameras on the entire time while responding to crowds during 12-hour

---

[74] *Id.* at 13.
[75] *Id.* at 14.
[76] *Id.* at 15.
[77] *Id.* at 18.
[78] *Id.* at 14.

shifts to preserve battery life."[79]

   a. The IMT found that what body camera footage does exist often depicted CPD officers violating law and policy including the following incidents: The IMT described video footage that reveals "many examples of officers communicating disrespectfully and using force."[80]

   b. In one instance the IMT documents footage depicting CPD officers "charging at people as the crowd disperses . . . One officer can be seen pushing and nearly tackling a person who appears to be standing by observing the incident."[81]

   c. "Another video depicts officers pushing and shoving people after a commotion breaks out and then throwing and tossing bikes, and another video depicts officers tackling some people amidst a commotion of pushing and shoving between people in the crowd and officers."[82]

   d. One video from May 30, 2020 depicts an officer aggressively pushing, tackling, and fighting with people on the ground and then arresting people.[83]  Another video from the same day show officers pushing, showing, and pulling people and using batons to push against protesters.

---

[79] *Id.* at 140
[80] *Id.* at 56.
[81] *Id.*
[82] *Id.*
[83] *Id.* at 70.

Additional video depicts officers throwing bikes, drawing their batons at crowds that are dispersing, pushing, and shoving. In one particularly violent incident "one officer tries to restrain a woman on the ground, other officers yell, "Pick her up." The officer continues to drag the woman a couple of feet before trying to pick her up."[84]

e. The IMT describes camera footage depicting CPD officers denying water to a pregnant, Black protester who CPD officers arrested. The officers then mocked the women for her request. The report contrasts the callous disdain the officers exhibited towards this women with the permissive, gentle approach officers used with a white male protester who was allowed to walk away from the same scene merely because he promised officers he would go home.[85]

f. The IMT Protest Report documents video evidence demonstrating officers swearing at protesters, threatening them, and calling protesters slurs like "pussy ass bitch" and "big ass bitch."[86]

g. IMT reviewed videos that "also depicted many instances of officers using force, including baton strikes and punches. For example, one video shows an officer jogging into the

---

[84] *Id.* at 71.
[85] *Id.* at 71.
[86] *Id.* at 71, 77.

crowd.  He then appears to turn toward someone, then grabs and starts punching the person.  In another instance, an officer gets into a tug-of-war with someone over a bike, and then appears to throw the bike at the person.  The person gets upset, begins walking towards the officer and stops.  Then the officer walks toward the person, further closing the gap between them, and shoves the person.  There was also footage of an officer swinging his baton like a baseball bat."[87]  The IMT Protest Report also describes CPD officers' indiscriminate use of O.C. spray.[88]

h.  The IMT noted that videos also depicted CPD officers engaging in inherently escalatory behavior.  In "several videos where officers appeared to advance, narrowing the spatial gap between the officers and the crowd, but gave the crowd no prior or subsequent instruction that would justify the officers getting closer (i.e., communicating the need for the crowd to move back).[89]  Additionally, "there were times when officers had their batons in their hands even when the crowd was docile or, in several instances, when officers were not near a crowd at all.  Officers would often

---

[87] *Id.* at 95.
[88] *Id.* at 95.
[89] *Id.* at 129.

walk toward crowds with them."[90]  "[S]ome officers may be more willing to start disrespectful interactions with people in crowds—or worse."[91]

i.  Body worn camera footage also revealed the depth of the animus CPD officers hold against protesters.  According to the IMT's review "in a number of instances, CPD officers made disparaging remarks about community members.  For instance, officers said things such as the following: "Somethin' gonna happen tonight.  I wanna hit this mother fucker right here.  There's more people coming.  They think they're something.  They all need they ass whooped. It's embarrassing."[92]  "In other instances, [CPD officers made] common references to community members as 'animals' and 'savages,' particularly when referencing people who were looting or participating in violence."[93]

### LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth Amendment – Excessive Force
### (All Plaintiffs Against Defendant Officer Grossklas)

167.  Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

168.  Count I is alleged against Defendant Officer Grossklas.

---

[90] *Id.* at 130.
[91] *Id.* at 193.
[92] *Id.* at 194.
[93] *Id.*

169.     As described in detail above, the Defendant Officer used unreasonable and excessive force, without legal cause, against Plaintiffs and/or failed to intervene to prevent the use of excessive force against Plaintiffs, in violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution.

170.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

171.     The actions of the Defendant Officer were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

### COUNT II – 42 U.S.C. § 1983
### Violation of the First Amendment – Freedom of Speech and Assembly, Intimidation and Retaliatory Use of Force
### (All Plaintiffs Against Defendant Officer Grossklas)

172.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

173.     Count II is alleged against all Defendant Officer Grossklas.

174.     As described in detail above, Plaintiffs were participating in lawful, constitutionally protected activity on the public streets of the City of Chicago.

175.     The actions of the Defendant Officer described above violated Plaintiffs' rights to freedom of speech and assembly guaranteed by the First and Fourteenth Amendments to the United States Constitution, in that Plaintiffs were abruptly prevented from further exercising their rights and suffered retaliation for having exercised their rights.

176.     The Defendant Officer retaliated against Plaintiffs for engaging in protected speech by subjecting them to excessive force without legal justification and/or failing to intervene to prevent the use of excessive force.  Plaintiffs' protected speech was the substantial

and motivating factor for the Defendant Officer's use of force against them. The Defendant

Officer's actions were intended to make Plaintiffs and other people engaging in constitutionally-

protected speech and assembly at the protests wary of continuing to engage in such protected

activities in the future and specifically to chill their rights guaranteed under the First

Amendment.

177. At all relevant times, the Defendant Officer was aware that Plaintiffs were

engaged in constitutionally-protected speech and assembly when he violated their rights. The

misconduct described in this Count was objectively unreasonable and was undertaken

intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional

rights.

178. The actions of the Defendant Officer were the direct and proximate cause of the

violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress,

anguish, humiliation, and loss of personal freedom, as set forth more fully above.

### COUNT III – 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment – Equal Protection
### (All Plaintiffs Against Defendant Officer Grossklas)

179. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

180. Count III is alleged against Defendant Officer Grossklas.

181. The Defendant Officer subjected Plaintiffs, some of whom are Black and all of

whom were protesting anti-Black racist police violence and in support of the movement for

Black lives, to excessive force and/or unlawful detention and arrest, and/or suppressed their right

to freedom of speech and assembly, with discriminatory motive and intent, and racial animus

toward each and every Plaintiff individually and as a group, either because of their identity

and/or because of what they were protesting and therefore violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

182.     The actions of the Defendant Officer were the direct and proximate cause of the violations of Plaintiffs' constitutional rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, and loss of personal freedom, as set forth more fully above.

## COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene
### (All Plaintiffs Against Defendant Superintendent Brown)

183.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

184.     Count IV is alleged against Defendant Superintendent David Brown in his individual capacity.

185.     During the events described above, the Defendant stood by without intervening to prevent the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments, even though he had the opportunity and duty to do so.

186.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiffs' clearly established constitutional rights.

187.     As a direct and proximate result of the Defendant's failure to intervene, Plaintiffs suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of personal freedom, and legal expenses, as set forth more fully above.

## COUNT V – 42 U.S.C. § 1983
### Unlawful Policy and Practice
### (All Plaintiffs Against Defendants City of Chicago and Superintendent Brown)

188.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

189.    Count V is alleged against Defendants City of Chicago and Superintendent David Brown in his official capacity.

190.    The Defendant Officers acted under the color of law, and under the authority of one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department, to violate Plaintiffs' rights as set for in the preceding claims.

191.    The City of Chicago through its Police Department, Police Superintendent, Police Board, Mayor, and City Council has interrelated *de facto* policies, practices, and customs which included, *inter alia*:

a.  Using excessive force against protesters without justification, including but not limited to: beating individuals with batons; beating protesters through punching, kicking, kneeing, and stomping; using chemical agents like pepper spray and tear gas; tackling protesters to the ground; and hitting individuals with bikes.

b.  Using lethal force against protesters, including but not limited to striking protesters on the head and neck with batons.

c.  Retaliating against protesters who record the police and/or speak out against police violence.

d.  Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate CPD's animus toward protesters.

e.  Falsely arresting protesters for engaging in protected speech and assembly.

f.  Targeting those the CPD has identified as, or perceives to be, leaders, protest marshals, legal observers, and medics for excessive force and false arrest.

g.  Giving protesters no reasonable opportunity to leave and/or trapping protesters in enclosed areas.

h.  Using chemical agents like pepper spray and/or tear gas without prior warning.

i.  Breaking, stealing, or otherwise disposing of protesters' belongings, including bikes, cameras, phones, glasses, goggles, and backpacks.

j.  Failing to intervene to prevent police violence and other forms of misconduct.

k.  Failing to hold officers accountable who violate protesters' rights.

l.  Failing to train officers on how to appropriately respond to protesters.

m.  Maintaining, condoning, and failing to take any steps to end the code of silence in the CPD that allows Chicago police officers to violate protesters and other civilians' rights with impunity.

192.    The interrelated policies, practices, and customs alleged above are or should be well-known within the CPD.

193.    The CPD is aware of the harms suffered by Plaintiffs and other protesters as a result of the interrelated policies, practices, and customs alleged above.

194.    The City has implemented, enforced, encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiffs' and other protesters' First, Fourth, and Fourteenth Amendment rights.

195.    The City has acted with deliberate indifference to the First, Fourth, and Fourteenth Amendment rights of the Plaintiffs.  As a direct and proximate result of the acts and

omissions of the City and CPD, the First, Fourth, and Fourteenth Amendment rights of the
Plaintiffs have been violated.

196.    Defendant Superintendent Brown, in his role as Superintendent of the CPD, was
the final policymaker for CPD's response to the protests.

197.    Defendant Superintendent Brown developed and maintained policies, practices,
procedures, and customs of Chicago Police officers using excessive force against protesters and
falsely arresting protesters, exhibiting deliberate indifference to the constitutional rights of
Plaintiffs, including but not limited to those policies, practices, procedures, and customs
described above, which caused the violation of Plaintiffs' rights as described herein and the
resultant damages suffered.

198.    Defendant Superintendent Brown had the power to prevent or aid in the
prevention of the wrongs done and conspired to be done as described herein, yet failed or refused
to do so, in violation of 42 U.S.C. § 1983.

199.    Upon information and belief, Defendant Superintendent Brown was deliberately
indifferent to the need for further training, supervision, or discipline related to the use of force
against protesters, as reflected by the continued maintenance of the policies, practices, and
customs of using excessive force that was carried out by Chicago Police officers under his
control.

200.    The actions and omissions of Defendant Superintendent Brown as described
herein were done with knowing disregard for the constitutional rights of the Plaintiffs.
Defendant Superintendent Brown acted maliciously, willfully, wantonly, and in reckless
disregard of Plaintiffs' rights under the Constitution.

201.     The policies, practices, procedures, and customs of the CPD were the direct and

proximate cause of the violations of Plaintiffs' constitutional rights and the damages they

suffered, including bodily injury, pain, suffering, mental distress, anguish, and loss of personal

freedom, as set forth more fully above.

**COUNT VI – Illinois State Law Claim**
**Violations of the Illinois Constitution**
**(All Plaintiffs Against Defendant Officer Grossklas)**

202.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

203.     Count VI is alleged against Defendant Officer Grossklas.

204.     The actions taken by the Defendant Officer denied Plaintiffs their state

constitutional rights to be free from an unreasonable seizure and to free expression and assembly

in a peaceable manner; as provided by the Illinois Constitution, Article I, sections 1, 2, 4, 5, and

6, and were a direct and proximate cause of Plaintiffs' injuries as set forth above.

205.     The actions of the Defendant Officer were the direct and proximate cause of the

violations of Plaintiffs' Illinois State Constitutional Rights.

**COUNT VII – Illinois State Law Claim**
**Assault and Battery**
**(All Plaintiffs Against Defendant Officer Grossklas)**

206.     Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

207.     Count VII is alleged against Defendant Officer Grossklas.

208.     As described in detail above, the Defendant Officer physically abused Plaintiffs

by pushing them, causing bodily harm.

209.     The actions of the Defendant Officer were affirmative acts and threatened to

cause or did cause an unpermitted contact of a harmful and/or offensive nature, to which

Plaintiffs did not consent, and thus constitute assault and battery under laws of the State of Illinois.

210.    The actions of the Defendant Officer were committed in a willful and wanton manner.

211.    The Defendant Officer's actions directly and proximately caused injury and damage as set forth above.

**COUNT VIII – Illinois State Law Claim**
**Intentional Infliction of Emotional Distress**
**(All Plaintiffs Against Defendant Officer Grossklas)**

212.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

213.    Count VIII is alleged against Defendant Officer Grossklas.

214.    The conduct and actions of the Defendant Officer set forth above were extreme and outrageous.  The Defendant's actions were rooted in an abuse of power and authority, and were done intentionally, willfully and wantonly, and/or knowing that there was a high probability that their conduct would cause Plaintiffs severe emotional distress as set forth above.

215.    As a direct and proximate cause of the extreme and outrageous conduct of the Defendant Officer, Plaintiffs were injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois State law.

**COUNT IX – State Law Claim**
**Respondeat Superior**
**(All Plaintiffs Against Defendant City of Chicago)**

216.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

217.    Count IX is alleged against Defendant City of Chicago.

218.    In committing the acts alleged in this Complaint, the Defendant Officer was a member of, and agent of, the CPD, acting at all relevant times within the scope of his employment.

219.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**COUNT X – State Law Claim**
**Indemnification**
**(All Plaintiffs Against Defendant City of Chicago)**

220.    Plaintiffs repeat and re-allege the foregoing paragraphs as if fully set forth herein.

221.    Count X is alleged against Defendant City of Chicago.

222.    In Illinois, pursuant to 735 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

223.    The Defendant Officer acted within the scope of his employment in committing the misconduct described herein.  Therefore, Defendant City of Chicago is liable as his employer for any resulting damages or award of attorney's fees.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor against the Defendants in the following manner:

1.    Award Plaintiffs compensatory and punitive damages.

2.    Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.    Award Plaintiffs such other and further relief as this Court may deem appropriate and just.

**JURY DEMAND**

Plaintiffs demand trial by jury.


Dated: May 11, 2023

                       Respectfully submitted,

                       /s/ Vanessa del Valle
                       Vanessa del Valle

                       Vanessa del Valle
                       Roderick and Solange MacArthur
                       Justice Center
                       Northwestern Pritzker School of Law
                       375 East Chicago Avenue
                       Chicago, IL 606611-3609
                       312-503-5932
                       vanessa.delvalle@law.northwestern.edu

                       /s/ Sheila A. Bedi
                       Sheila A. Bedi

                       Sheila A. Bedi
                       Community Justice and Civil Rights Clinic
                       Northwestern Pritzker School of Law
                       375 East Chicago Avenue
                       Chicago, IL 60611-3609
                       312-503-8576
                       sheila.bedi@law.northwestern.edu

                       /s/ Joey L. Mogul
                       Joey L. Mogul

                       Joey L. Mogul, Janine Hoft, Ben Elson
                       Jan Susler, Brad Thomson
                       People's Law Office
                       1180 N. Milwaukee Ave.
                       Chicago, IL 60642
                       773-235-0070
                       joeymogul@peopleslawoffice.com
                       janinehoft@peopleslawoffice.com
                       ben@peopleslawoffice.com

brad@peopleslawoffice.com
jsusler@peopleslawoffice.com